UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
LORI SCHARFF, MICHAEL GODINO, EDWARD
MOLLOY and LONG ISLAND COUNCIL OF THE
BLIND,

                       Plaintiffs,                **MEMORANDUM & ORDER**
                                                      **10 CV 4208 (DRH)(AKT)**

          -against-

COUNTY OF NASSAU and SHILA
SHAH-GAVNOUDIAS, COMMISSIONER OF
NASSAU COUNTY PUBLIC WORKS, in her
official capacity,

                       Defendants.
-----------------------------------------------------------------X
**APPEARANCES:**

**NASSAU SUFFOLK LAW SERVICES COMMITTEE**
Attorneys for Plaintiff
1757 Veterans Highway, Suite 50
Islandia, New York 11749
By: Robert Briglio, Esq.

**LAW OFFICE OF MARTIN J. COLEMAN, P.C.**
Attorneys for Plaintiff
100 Crossways Park Dr. West, Suite 412
Woodbury, New York 11797
By: Martin J. Coleman, Esq.

**NASSAU COUNTY ATTORNEY**
**JOHN CIAMPOLI**
Attorneys for Defendants
One West Street
Mineola, New York 11501
By: Ralph J. Reissman, Esq.

**HURLEY, Senior District Judge:**

      Plaintiffs Lori Scharff ("Scharff"), Michael Godino ("Godino"), Edward Molloy

("Molloy") and the Long Island Council of the Blind ("LICB") (collectively, "Plaintiffs"), brought

this action under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*

("ADA"), and the Rehabilitation Act, 29 U.S.C. § 794 *et seq.* ("Rehabilitation Act") claiming that defendants County of Nassau ("County") and Shila Shah-Gavnoudias, Commissioner of Nassau County Public Works, in her official capacity (collectively, "Defendants"), violated their rights by failing to adopt a scheduled installation of Accessible Pedestrian Signals ("APS") at intersections where pedestrian crossing signals were currently provided, and by failing to install APS each time the County altered or installed pedestrian crossing signals, including when Defendants engaged in a traffic signal replacement project between 2008 and 2011. Presently before the Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons set forth below, the parties' motions are denied.

## BACKGROUND

The material facts, drawn from the Amended Complaint and the parties' Local Civil Rule 56.1 Statements, are undisputed unless otherwise noted.

## I. *Plaintiffs*

Plaintiffs are blind, deaf-blind or severely visually impaired individuals who reside near Hempstead Avenue, in Nassau County, New York, and who are members, and former or current officers, of LICB. The Council "is a private, volunteer organization affiliated with the American Council of the Blind of New York, Inc." ("ACBNY"). (Pls.' R. 56.1 Stmt. ¶ 3.) ACBNY is a not-for-profit corporation comprised of chapters or affiliates, such as LICB, which focus on either a geographic area, a specific population, or an issue within New York State.

LICB's stated Constitutional Purpose is to "[e]ducate the public as well as the blind and visually impaired as to the rights, responsibilities, problems and potentials of blind and visually impaired persons; providing maximum opportunities to become self-sufficient, self-supporting and

productive members of society." (*Id.* ¶ 6.)  LICB educates the public about its goals, and holds advocacy meetings and events that are intended to encourage and educate governmental officials to meet LICB's goals.  One long term project of LICB has been advocating for the installation of APS along the roadways in its geographical area.

"APS are pedestrian, street crossing signal technologies that can be installed with standard pedestrian crossing signal equipment, and which provide auditory and tactile information that gives blind and visually impaired persons the same or similar information provided by purely visual pedestrian signals to sighted persons." (*Id.* ¶ 10.)  One type of APS is the Polara Navigator, which adds audio equipment to communicate information, and a push button that activates an "audio crossing signal which has a non-verbal audio homing sound used to locate the button and a tactile arrow to indicate the direction of travel governed by the signal." (*Id.* ¶ 11.)  The Polara Navigator has been commercially available since 2003.  (*Id.* ¶ 45.)  Prior to the commencement of the instant litigation, LICB's officers and members spent substantial amounts of time trying to achieve the organization's mission of obtaining the installation of APS.

Blind and severely visually impaired individuals rely in part, or in whole, on their senses of hearing when attempting independently to cross a street.  Thus, the "purpose of installing APS is to improve the safety of visually impaired people as they cross streets with pedestrian signals." (*Id.* ¶ 13.)  However, Plaintiffs' ability to safely cross streets using their sense of hearing has decreased during the past decade, and will likely continue to decrease, because of the presence of vehicles with "quiet engine technologies." (*Id.* ¶¶ 15, 16.)

Although "[m]any of the destinations . . . Scharff utilizes for her daily needs could be [traveled to] by walking, . . . Scharff has chosen not to risk her safety by independently crossing

Hempstead Avenue because of the lack of APS at the various signalized intersections." (*Id.* ¶¶ 18, 19.)  Thus, Scharff's "independent activities are substantially limited" by "the lack of APS along Hempstead Avenue," and she must pay "substantially higher travel fees charged by paratransit rides and taxis to get to destinations." (*Id.* ¶¶ 20, 21.)  Godino and Molloy face similar difficulties "in independently crossing Hempstead Avenue at intersections that are currently controlled by non-APS pedestrian signals." (*Id.* ¶ 25.)  Thus, Plaintiffs wish "to use APS at . . . intersections under the ownership or control of Nassau County to facilitate their ability independently and safely to travel to as many parts of Nassau County as possible." (*Id.* ¶ 27.)

## II.    *Defendants*

The County "owns approximately 1600 signalized intersections." (*Id.* ¶ 31.)  The Nassau County Department of Public Works ("DPW") provides the public with "pedestrian street crossing signals and related equipment" which provide "a means for pedestrians to cross streets in a safer manner than if they crossed streets at uncontrolled intersections." (*Id.* ¶ 32.)  "DPW has installed APS at approximately ten intersections in Nassau County"; however, it "has not installed APS at any of the intersections along Hempstead Avenue to date." (*Id.* ¶¶ 33, 34.)  The APS that were installed by DPW "were installed in response to requests from County residents to install APS at intersections near their residences." (*Id.* ¶ 35.)  The County's APS units cost approximately $400 each. (Defs.' R. 56.1 Stmt. ¶ 14.)  DPW does not have a "formalized policy or process related to the installation of APS." (Pls.' R. 56.1 Stmt. ¶ 36.)

However, according to Defendants, it is not possible to install APS at every intersection because the existing buildings, trees or other structures prevent the proper installation of the pedestrian signal pole and APS unit.  Defendants state that access to the underground electrical

wires needed for the installation of APS may be "prevented by the existence of underground gas mains, water mains, electrical wires, sewers, signal cables and other obstructions." (Defs.' R. 56.1 Counterstmt. ¶ 10.) Further, Defendants assert that, in many cases, the proper placement of APS is prevented by the orientation or configuration of existing curb ramps, roads and sidewalks.

Moreover, Defendants argue that "it is not [always] possible to safely install an APS unit to meet [the] optional safety guidelines issued by the Manual of Uniform Traffic Control Devices (the "MUTCD"), which itself recognizes that installation of APS is strictly discretionary with any municipality or public entity." (*Id.*) In addition, Defendants state that the County may not own or have access to the sidewalk areas where an APS could be installed. Indeed, Defendants claim that, "in at least one instance, where the County intended to install an APS unit in the Incorporated Village of Garden City[,] . . . the Village of Garden City Buildings Department issued a 'Stop Work' order preventing the County from installing the APS unit in the desired and appropriate manner, and the installation had to be reconfigured." (*Id.*)

During the time period of 2008 to 2011, "DPW reconstructed existing pedestrian signals along Hempstead Avenue in Malverne and West Hempstead," which included replacing operative parts and wiring the pedestrian signals "to the County's centralized computer control equipment" ("Reconstruction Project"). (Pls.' R. 56.1 Stmt. ¶¶ 37, 38.) In addition, existing pedestrian signal heads were replaced during the Reconstruction Project with "countdown" signal heads, a technology that was newly available at the time of installation. The countdown signal heads "display[] a visual number countdown of the time pedestrians have to safely cross the streets," and are designed to "enhance pedestrian safety while crossing intersections." (*Id.* ¶¶ 39, 40.) "The new countdown signal heads installed along Hempstead Avenue from 2008-2011 did not have an

audio (aural) component designed to communicate the visual information provided to the general public by the signal heads to individuals who cannot see the visual information provided by the countdown signal heads." (*Id.* ¶ 42.)

DPW's former commissioner, Raymond Ribeiro ("Ribeiro"), "first became aware of the needs of visually impaired citizens to safely cross streets in 1996-1998 while he worked as a Traffic Engineer II for Nassau County." (*Id.* ¶ 43.) Moreover, the former leader of the County's Traffic Engineering Division, Harold Lutz ("Lutz"), "had been aware of public requests for APS technologies at least since the 2003 Manual on Uniform Traffic Control Devices was adopted." (*Id.* ¶ 44.) Plaintiffs met with officials from DPW and the Office of the Physically Challenged from 2006 to September 2007, "to educate those officials about APS technologies and the [P]laintiffs' need to have APS throughout Nassau County." (*Id.* ¶¶ 46, 47.) Ribeiro and Lutz "represented DPW at several of the APS meetings." (*Id.* ¶ 48.) During the APS meetings, DPW officials considered the Polara Navigator technology. "DPW officials investigated the Navigator APS to determine whether it was appropriate for use [to] assist blind individuals crossing Nassau County's roadways, and ultimately approved it for use . . . ." (*Id.* ¶ 50.)

At the APS meetings, Godino and LICB member, John Jeavons, also provided the County with two written lists of intersections located in the County for which they requested the installation of APS technology. Lutz considered these requests a higher priority than typical requests because they came from a committee that had been specifically formed to address APS needs in the County. DPW employees visited the listed intersections and noted the possibility of installing APS at those locations.

Ribeiro knew that "Godino lived along Hempstead Avenue and that Godino wanted APS

6

installed at pedestrian signals near his house along Hempstead Avenue." (*Id.* ¶ 52.) Similarly, Lutz was aware of Godino's "requests for installation of APS along Hempstead Avenue." (*Id.* ¶ 60.) Lutz spoke with Deborah Goehner ("Goehner"), a member of the 2006-2007 APS committee and the DPW official responsible for overseeing the design phase of the Reconstruction Project, about installing APS at intersections located within the Reconstruction Project. (*Id.* ¶¶ 59, 61.)

At the time he left his employment with the County, Ribeiro had been "in the process of developing a formalized county-wide policy relat[ing] to the installation of APS on a scale that went beyond receipt of requests from community members relat[ing] to intersections near their homes." (*Id.* ¶ 63.) "Ribeiro considered his efforts to develop an APS installation on a wider basis throughout Nassau County to be similar" to what he believed "was required by an ADA transition plan." (*Id.* ¶ 64.) However, "[m]uch of the documentation of DPW's investigation into and planning of an APS installation policy which was maintained by . . . Lutz has been lost." (*Id.* ¶ 65.)

## DISCUSSION

### I.   *Summary Judgment Standard*

Summary judgment, pursuant to Rule 56, is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable

factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination[s] of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential

element of the nonmoving party's claim." *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.     *The ADA and Rehabilitation Act*

The ADA was enacted to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). It proscribes discrimination against individuals with disabilities in three major areas of public life: (1) employment and hiring (Title I); (2) access to public services, programs, and activities (Title II); and (3) public accommodations (Title III). *Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004). The Plaintiffs in this case rely upon the anti-discrimination provision of Title II, which provides as follows: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In addition, the regulations promulgated under Title II provide that "[n]o qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity," 28 C.F.R. § 35.130(a), and "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28

C.F.R. § 35.150(a).[1]

Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

In order to establish a violation under the ADA, Plaintiffs must allege: "(1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (citing *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998)). "These requirements apply with equal force to [P]laintiffs' Rehabilitation Act claims." *Hargrave v. Vermont*, 340 F.3d 27, 35 (2d Cir. 2003). Additionally, to establish a violation under the Rehabilitation Act, a plaintiff must show that the benefit is part of a "program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). *See also Doe*, 148 F.3d at 82.

Here, in addition to claiming that Defendants did not comply with their obligations to provide individuals with disabilities with accessibility to "services, programs, or activities" pursuant to the Rehabilitation Act, Title II, and Title II's regulations, Plaintiffs claim that Defendants violated Title II's regulations pertaining to a public entity's existing, newly constructed

---

[1] "Congress explicitly authorized the Attorney General to promulgate regulations under the ADA, *see* 42 U.S.C. § 12134(a)," and, therefore, "the regulations 'must [be given] legislative and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute.'" *Parker v. Universidad de P.R.*, 225 F.3d 1, 5 n.5 (1st Cir. 2000) (alteration in original) (quoting *United States v. Morton*, 467 U.S. 822, 834 (1984)).

and altered facilities, 28 C.F.R. §§ 35.149-35.151.

## III.    *Analysis*

Plaintiffs claim that Defendants violated the general prohibitions against discrimination found in Title II, the Rehabilitation Act, and the federal regulations, i.e., 42 U.S.C. § 12132, 29 U.S.C. § 794(a), and 28 C.F.R. § 35.130(a), as well as federal regulations pertaining to a public entity's facilities, i.e., 28 C.F.R. §§ 35.149-35.151.  Each of these claims requires a showing that a County service, program or activity is at issue, and, additionally, 28 C.F.R. §§ 35.149-151 require a showing that a County facility is at issue.  The Court will address these prerequisites as a preliminary matter.

Notably, Defendants concede that the County is a public entity that is subject to the ADA,[2] and that Plaintiffs are qualified individuals with disabilities.  In addition, the Defendants do not contest LICB's standing to bring this action.  The thrust of Defendants' arguments, therefore, is that pedestrian crossing signals do not constitute services, programs, activities, or facilities.  However, as discussed below, the Court agrees with Plaintiffs' position that, for purposes of the ADA and Rehabilitation Act, the installation and maintenance of pedestrian crossing signals constitute a County service, program or activity, and that pedestrian crossing signals, walkways and crossings constitute facilities.[3]

---

[2] Defendants similarly appear to concede that the County is subject to the Rehabilitation Act as there is no dispute that Defendants received federal funding for the Reconstruction Project.

[3] Parenthetically, the Court notes that the exact phrasing or designation of the "service, program or activity," and "facility" at issue is not critical to the Court's determination.  *See Frame v. City of Arlington*, 657 F.3d 215, 226 (5th Cir. 2011) (Acknowledging that while the service, program, or activity at issue could be framed as either the "*building* and *altering* sidewalks" or the "sidewalk *itself*," the case did not turn on how the issue was framed because, "[e]ither way, when a city decides to build or alter a sidewalk and makes that sidewalk inaccessible to individuals with disabilities without adequate justification, the city unnecessarily denies disabled individuals the benefits of its services in violation of Title II") (footnote and citation omitted).  In addition, Plaintiffs claim that

11

### A. Services, Programs, or Activities

"The ADA does not explicitly define 'services, programs, or activities.' " *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 44 (2d Cir. 1997), *superseded on other grounds, Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001). "Rather than determining whether each function of a city can be characterized as a service, program, or activity for purposes of Title II," several Circuit Courts "have construed 'the ADA's broad language [as] bring[ing] within its scope anything a public entity does.' " *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (alteration in original) (quoting *Lee v. City of L.A.*, 250 F.3d 668, 691 (9th Cir. 2001)); *accord Yeskey v. Commonwealth of Pa. Dep't of Corr.*, 118 F.3d 168, 171 (3d Cir. 1997), *aff'd*, 524 U.S. 206 (1998); *see also Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998) (finding that "the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does").

When determining whether New York City's zoning decisions constituted "programs,

---

Defendants violated 28 C.F.R. § 35.130(b)(1), which prohibits a public entity from discriminating against individuals with a disability when "providing any aid, benefit, or service." The parties do not provide significant argument regarding this provision, but suffice it to say that, here, too, while the exact phrasing or designation of the "aid, benefit, or service" is not determinative, the aid, benefit, or service at issue in this case is the ability to use the pedestrian crosswalk signals and crosswalks. *See Civic Ass'n of Deaf of N.Y.C., Inc. v. Giuliani*, 915 F. Supp. 622, 635 (S.D.N.Y. 1996) ("Regardless of the definition of the aid, benefit, or service supplied by the City, Defendants would violate [28 C.F.R. § 35.130(b)(1)] if they were to remove the street alarm boxes without replacing them with a notification alternative" because, "[d]enied the ability to report fires from the street, Plaintiffs would have their participation in and benefit from both street reporting and emergency reporting as a whole limited quantitatively and qualitatively."). Similarly, Plaintiffs claim that Defendants violated 28 C.F.R. § 35.160, which requires "[a] public entity [to] furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." As to this claim, the Court finds that APS constitute the type of auxiliary aid or service contemplated under 28 C.F.R. § 35.160. *See* 28 C.F.R. § 35.104 (defining "Auxiliary aids and services" as including, among other things, "Qualified readers; taped texts; audio recordings; Brailled materials and displays; screen reader software; magnification software; optical readers; secondary auditory programs (SAP); large print materials; accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision").

services, or activities," the Second Circuit, in *Innovative Health Sys.*, observed that Section 508 of the Rehabilitation Act, 29 USC § 794(b)(1)(A), "defines 'program or activity' as 'all of the operations' of specific entities, including 'a department, agency, special purpose district, or other instrumentality of a State or of a local government,' " and the "plain meaning of 'activity' is a 'natural or normal function or operation.' " 117 F.3d at 44 (citations omitted). Thus, the Second Circuit agreed with the District Court's determination that "both the ADA and the Rehabilitation Act clearly encompass zoning decisions by the City because making such decisions is a normal function of a governmental entity." *Id.* The Second Circuit further reasoned that " 'programs, services, or activities' . . . is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context," and that treating the phrase as a catch-all "should avoid the . . . type of hair-splitting arguments" involved in determining which governmental functions constitute "programs, services, or activities." *Id.* at 44-45. In sum, "[t]he focus of the inquiry . . . is not so much on whether a particular public function can technically be characterized as a service, program, or activity, but whether it is a normal function of a governmental entity." *Barden*, 292 F.3d at 1076 (citations and internal quotation marks omitted).

According to Plaintiffs, "[t]he installation and maintenance of pedestrian crossing signals at crosswalks fall[s] under the ADA's terms of 'services, programs, or activities of a public entity.' " (Pls.' Mem. in Support at 13.) The Court agrees.[4] The act of installing and

---

[4] Although Defendants vehemently deny upon the instant motions that pedestrian crossing signals constitute services, programs, or activities under the ADA and Rehabilitation Act, Defendants contradictorily admitted, upon their response to Plaintiff's Request for Admission of Facts, that "Nassau County provides to the general public, through its pedestrian street crossing signals and related equipment, pedestrian street crossing programs, activities or services." (Exh. 38 to Affirmation of Martin J. Coleman, dated November 19, 2012, at ¶ 5.)

maintaining pedestrian crossing signals at crosswalks is a normal function of the County, and therefore falls within the scope of Title II and the Rehabilitation Act. *See Barden*, 292 F.3d at 1076 (finding that "maintaining public sidewalks is a normal function of a city and . . . therefore falls within the scope of Title II"); *Hason v. Med. Bd. of Cal.*, 279 F.3d 1167, 1173 (9th Cir. 2002) (finding that "[m]edical licensing is without a doubt something that the Medical Board 'does' " . . . and, therefore, "clearly falls within the scope of Title II"); *Johnson*, 151 F.3d at 570 (finding that Title II applies to public contracting); *Cal. Council of the Blind v. Cnty. of Alameda*, 2013 WL 5770560, at *7 (N.D. Cal. Oct. 24, 2013) (finding that "[t]he provision and maintenance of voting systems . . . is a normal function of a government entity," and, therefore, "under the terms of the ADA or the Rehabilitation Act, the covered entity must provide meaningful access to private and independent voting" (citation and internal quotation marks omitted)).

### B.     *Facilities*

28 C.F.R. § 35.149 prohibits discrimination in the form of a public entity's facilities being inaccessible to the disabled. Specifically, 28 C.F.R. § 35.149 states:

> Except as otherwise provided in § 35.150, no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

"Facility" is defined in 28 C.F.R. § 35.104 as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure,

or equipment is located."  "Exiting facility" is defined as "a facility in existence on any given

date, without regard to whether the facility may also be considered newly constructed or altered

under this part."  28 C.F.R. § 35.104.

The regulations implementing Title II contain different requirements depending upon

whether the facilities at issue are existing, or are newly constructed or altered.  As the Third

Circuit observed:

> [T]he Department of Justice issued regulations maintaining the previously
> established distinction between existing facilities, which are covered by 28
> C.F.R. 35.150 (1992), and new construction and alterations, which are covered
> by 28 C.F.R. 35.151 (1992).  With limited exceptions, the regulations do not
> require public entities to retrofit existing facilities immediately and completely.
> Rather, a flexible concept of accessibility is employed, and entities are generally
> excused from making fundamental alterations to existing programs and bearing
> undue financial burdens. 28 C.F.R. 35.150(a) & (b) (1992).  In contrast, the
> regulations concerning new construction and alterations are substantially more
> stringent.  When a public entity independently decides to alter a facility, it "shall,
> to the maximum extent feasible, be altered in such a manner that the altered
> portion of the facility is readily accessible to and usable to individuals with
> disabilities." 28 C.F.R. 35.151(b) (1992).  This obligation of accessibility for
> alterations does not allow for non-compliance based upon undue burden.

*Kinney v. Yerusalim*, 9 F.3d 1067, 1071 (3rd Cir. 1993).  Thus, 28 C.F.R. § 35.150, which

addresses "[e]xisting facilities," provides, in relevant part:

> (a) General. A public entity shall operate each service, program, or activity so
> that the service, program, or activity, when viewed in its entirety, is readily
> accessible to and usable by individuals with disabilities.  This paragraph does
> not--
>
> (1) Necessarily require a public entity to make each of its existing facilities
> accessible to and usable by individuals with disabilities; [or]
>
> . . . .

(3) Require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with § 35.150(a) of this part would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity.

. . . .

(d) Transition plan.

(1) In the event that structural changes to facilities will be undertaken to achieve program accessibility, a public entity that employs 50 or more persons shall develop, within six months of January 26, 1992, a transition plan setting forth the steps necessary to complete such changes. A public entity shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in the development of the transition plan by submitting comments. A copy of the transition plan shall be made available for public inspection.

(2) If a public entity has responsibility or authority over streets, roads, or walkways, its transition plan shall include a schedule for providing curb ramps or other sloped areas where pedestrian walks cross curbs, giving priority to walkways serving entities covered by the Act, including State and local government offices and facilities, transportation, places of public accommodation, and employers, followed by walkways serving other areas.

In addition, 28 C.F.R. § 35.151, which addresses "[n]ew construction and alterations" to

facilities, provides, in pertinent part:

(a) Design and construction.

(1) Each facility or part of a facility constructed by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities, if the construction was commenced after January 26, 1992.

(2) Exception for structural impracticability.

(i) Full compliance with the requirements of this section is not required where a public entity can demonstrate that it is structurally impracticable to meet the requirements. Full compliance will be considered structurally impracticable only in those rare circumstances when the unique characteristics of terrain prevent the incorporation of accessibility features.

(ii) If full compliance with this section would be structurally impracticable, compliance with this section is required to the extent that it is not structurally impracticable. In that case, any portion of the facility that can be made accessible shall be made accessible to the extent that it is not structurally impracticable.

(iii) If providing accessibility in conformance with this section to individuals with certain disabilities (e.g., those who use wheelchairs) would be structurally impracticable, accessibility shall nonetheless be ensured to persons with other types of disabilities, (e.g., those who use crutches or who have sight, hearing, or mental impairments) in accordance with this section.

(b) Alterations.

(1) Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992.

## 1.      The Parties' Arguments

Defendants argue that APS are not required under the ADA because the term "pedestrian traffic signals" is not included in the definition of "Facilities." (Defs.' Mem. in Opp'n. at 12.)

Defendants further argue that because the ADA's "Transition Plan," Section 35.150(d), requires sidewalks to have curb ramps, but makes no mention of or reference to APS, the ADA intended to exclude APS from its requirements. (*Id.*) Thus, Defendants conclude that "[i]f Congress intended pedestrian traffic signals to be covered by the ADA, Congress certainly knew how to do so, and would have done so." (*Id.* at 13.)

Plaintiffs, on the other hand, argue that pedestrian walkways and crossings are transportation facilities. (Pls.' Mem. in Support at 24.) Plaintiffs cite to the Department of Justice's commentary to 28 C.F.R. Part 35, in which the Department of Justice explains that the term "[f]acility . . . includes both indoor and outdoor areas where human-constructed improvements, structures, equipment, or property have been added to the natural environment." (*Id.* (quoting Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. 35,694, 35,700 (July 26, 1991)).) In addition, Plaintiffs cite the regulation's definition of "facility" as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." (*Id.* (quoting 28 C.F.R. § 35.104).) Finally, in support of their position, Plaintiffs cite *Barden*, 292 F.3d at 1077, in which the court found that public sidewalks are facilities subject to the accessibility regulations; *Parker*, 225 F.3d at 6-7, in which the court found that public gardens are facilities under Title II; and *Fortyune v. City of Lomita*, 823 F. Supp. 2d 1036, 1039 (C.D. Cal. 2011), in which the court seemingly found that on-street

accessible parking is a facility.[5]  (*Id.*)

###     2.      *Analysis*

Guidance on this issue is provided in a similar case, *Civic Ass'n of Deaf of N.Y.C., Inc. v. Giuliani*, 970 F. Supp. 352, 359 (S.D.N.Y. 1997), in which the court found that alarm boxes used to report emergencies from the street were "part of the 'equipment' provided by the City for reporting emergencies," and, thus, fell within the regulations' definition of "facility."  In that case, the "service, program or activity" at issue was characterized as either "the emergency reporting system as a whole," or "the street reporting system alone." *Id.* at 360-61. Analogously, here, the "service, program or activity" at issue is, as discussed above, the installation and maintenance of pedestrian crossing signals at crosswalks, and the pedestrian crossing signals, walkways and crossings constitute facilities.  Clearly, the pedestrian crossing signals are part of the equipment provided by the County to notify pedestrians of when it is safe to cross the street at the crosswalks.

The Fifth Circuit's decision in *Frame* also supports a finding that pedestrian crossing signals, walkways and crossings are facilities.  In that case, when determining that Title II "extend[ed] to newly built and altered sidewalks," the court observed:

> Congress anticipated that Title II would require local governments "to provide curb cuts on public streets" because the "employment, transportation, and public accommodation sections of [the ADA] would be meaningless if people who use wheelchairs were not afforded the opportunity to travel on and between streets."

---

[5] Parenthetically, while the Court's holding in *Fortyune*, that "the broad language of the ADA requires public entities to ensure that all services, including on-street parking, are reasonably accessible to and usable by individuals with disabilities," generally supports Plaintiffs' position, the *Fortyune* decision is unclear as to whether the Court determined that on-street parking constitutes a "facility" or rather a "service" for purposes of the ADA. *Fortyune*, 823 F. Supp. 2d at 1038-39.  Nevertheless, as noted previously, the designation is not outcome determinative.

Implicit in this declaration is a premise that sidewalks are subject to Title II in the first place. Congress's specific application of Title II is consistent with its statutory findings. In enacting Title II, Congress found that individuals with disabilities suffer from "various forms of discrimination," including "isolat[ion] and segregat[ion]," and that inaccessible transportation is a "critical area [ ]" of discrimination. Moreover, Congress understood that accessible transportation is the "linchpin" that "promotes the self-reliance and self-sufficiency of people with disabilities." Continuing to build inaccessible sidewalks without adequate justification would unnecessarily entrench the types of discrimination Title II was designed to prohibit.

Title II does not only benefit individuals with disabilities. Congress recognized that isolating disabled individuals from the social and economic mainstream imposes tremendous costs on society. Congress specifically found that disability discrimination "costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity." Congress also anticipated that "the mainstreaming of persons with disabilities will result in more persons with disabilities working, in increasing earnings, in less dependence on the Social Security system for financial support, in increased spending on consumer goods, and increased tax revenues." The Rehabilitation Act was passed with similar findings and purpose. Continuing to build inaccessible sidewalks without adequate justification would unnecessarily aggravate the social costs Congress sought to abate.

To conclude, it would have come as no surprise to the Congress that enacted the ADA that Title II and its implementing regulations were being used to regulate newly built and altered city sidewalks. Indeed, Title II unambiguously requires this result.

657 F.3d at 230-31 (alteration in original) (footnotes and citations omitted). Likewise, here, the accommodation sections of Title II will be meaningless, and social costs will be aggravated, if people who are blind or visually impaired are not afforded the opportunities to travel safely on and between streets.

Moreover, the Court is unpersuaded by Defendants' argument that pedestrian traffic signals and APS are not required by the ADA and Rehabilitation Act because they are not

specifically included in the definition of "facilities."  Case law reveals that there is no

requirement that the ADA explicitly reference APS in order for APS to be subject to the ADA's

requirements.  *See Barden*, 292 F.3d at 1077 (finding that public sidewalks are subject to Title II,

even though no regulation "specifically address[ed] the accessibility of sidewalks"); *Fortyune*,

823 F. Supp. 2d at 1039 (finding that on-street parking is subject to Title II, even though no

regulations addressed same, because "public entities must provide the reasonable access required

by the ADA even in the absence of a specific regulation").

Similarly, even though the Architectural and Transportation Barriers Compliance Board

("Access Board") has proposed, but not yet promulgated, standards for public rights-of-way that

would require the installation of APS where pedestrian crossing signals are located, (Defs.'

Reply in Support at 3), the ADA and Rehabilitation Act may nevertheless presently require

installation of APS.  The Access Board is an independent federal agency that is directed to, *inter*

*alia*, "develop advisory information for, and provide appropriate technical assistance to,

individuals or entities with rights or duties under regulations prescribed pursuant to . . . [T]itle II

. . . with respect to overcoming architectural, transportation, and communication barriers," 29

U.S.C. § 792(b)(2), and establish and maintain "minimum guidelines and requirements for the

standards issued pursuant to [T]itle[] II."  29 U.S.C. § 792(b)(3)(B).  However, the "[Access]

Board's guidelines do not have any binding effect on their own, but instead help shape the

Attorney General's regulations, which must be 'consistent' with the Board's guidelines."

*Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*, 950 F. Supp. 389, 390

(D.D.C. 1996).  Moreover, the Access Board does not "hav[e] primary responsibility for either

enforcing the [ADA] or for interpreting it; at most it has a supplementary role."  *Id.* at 391.

Rather, Congress entrusted the Attorney General to promulgate regulations to carry out the provisions of Title II. *See* 42 U.S.C. § 12134(a). Thus, the fact that the Access Board drafted proposed guidelines regarding APS does not mean that APS are not presently required by the ADA or the Attorney General's regulations implementing the ADA. *See also Fortyune*, 823 F. Supp. 2d at 1038-39 (adopting the plaintiff's argument that "merely because a proposed new set of regulations will explicitly discuss the accessibility standards for a particular thing, does not mean that there were no obligations before" (citation and quotation marks omitted)).

Based upon the foregoing, Defendants' motion for summary judgment, which is premised upon their argument that pedestrian crossing signals are not included in, or required by, the ADA or the Rehabilitation Act, is denied.

## C.     *Defendants' Defenses*

Although the Court finds that pedestrian crossing signals are covered by the ADA and the Rehabilitation Act, Plaintiffs' motion for summary judgment must also be denied because there are triable issues of fact as to whether Defendants are entitled to the defenses provided under the relevant regulations. Both 28 C.F.R. § 35.130, the federal regulations' general prohibitions against discrimination, and 28 C.F.R. § 35.150, the federal regulation pertaining to existing facilities, contain an exception which provides that a public entity does not have to make any modifications or take any actions that would fundamentally alter the nature of the service, program, or activity. *See* 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."); 28

C.F.R. § 35.150(a) ("[28 CFR § 35.150(a)] does not-- . . . (3) Require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens.").[6]  However, 28 C.F.R. § 35.150(a)(3) provides that, "[i]f an action would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity."

In addition, 28 C.F.R. § 35.151(a), the federal regulation pertaining to the design and construction of facilities, contains an "[e]xception for structural impracticability," which provides that "[f]ull compliance with the requirements of [§ 35.151] is not required where a public entity can demonstrate that it is structurally impracticable to meet the requirements."  28 C.F.R. § 35.151(a)(2)(i).  Full compliance is "structurally impracticable only in those rare circumstances when the unique characteristics of terrain prevent the incorporation of accessibility features."  *Id.*  However, 28 C.F.R. § 35.151(a)(2)(ii) provides that "[i]f full compliance with [Section § 35.151] would be structurally impracticable, compliance with [Section § 35.151] is required to the extent that it is not structurally impracticable."

Moreover, 28 C.F.R. § 35.151(b)(1), which pertains to the alteration of facilities, provides that the public entity must alter the facility to be "readily accessible and usable by

---

[6] Additionally, 28 C.F.R. § 35.160, which pertains to communication auxiliary aids and services, and which requires a public entity to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity," 28 C.F.R. § 35.160(b)(1), contains a similar defense which provides that a public entity is not required "to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.164.

individuals with disabilities" "to the maximum extent feasible." This feasibility requirement has been construed as meaning "technical feasibility" rather than "economic feasibility." *See Disabled in Action of Pa. v. Southeastern Pa. Transp. Auth.*, 635 F.3d 87, 94-95 (3d Cir. 2011). Similarly, the 1991 American with Disabilities Act Accessibility Guidelines for Buildings and Facilities ("ADAAG"), which provide accessibility standards for the construction and alteration of facilities, afford a similar defense for technical infeasibility where alterations to a facility have, *inter alia*, "little likelihood of being accomplished because . . . existing physical or site constraints prohibit modification or addition of elements, spaces, or features which are in full and strict compliance with the minimum requirements for new construction and which are necessary to provide accessibility." 28 C.F.R. Pt. 36, App. A § 4.1.6(1)(j) (1991).

Defendants argue that these exceptions apply. Namely, Defendants argue that installation of APS would " 'fundamentally alter' the existing pedestrian crossing facilities and equipment," and that it is "structural[ly] impracticab[le]" and "technically infeasible" to install APS in some locations. (Defs.' Mem. in Opp'n. at 16, 17, 19.) In support of their position, Defendants provide the affidavit of Kenneth Arnold, Assistant to the Commissioner of DPW, who avers that:

> 10. APS cannot be installed at all intersections. In some cases, existing buildings, structures or trees prevent placement of the pedestrian signal pole and APS unit in or on the sidewalk leading to the curb ramp's path across the intersection, such that it would safely direct a blind or visually impaired person across the street. In addition, installation of a pedestrian pole and APS requires access to underground electrical wiring, and is sometimes prevented by the existence of underground gas mains, water mains, electrical wires, sewers, signal cables and other obstructions, all of which may preclude the APS from being installed safely and appropriately.
>
> 11. Further, the pushbutton head of the APS unit, which emits a "locating tone" to indicate to blind or visually impaired individuals where the APS unit is

located, and the tactile raised arrow on the pushbutton head of the unit, must lead directly down to the curb ramp in the perpendicular direction, and the curb ramp must line up directly with the curb ramp on the opposing side of the street, which is not the case at many County intersections, where only one centralized curb ramp is provided but is oriented toward the center of the intersection. In many cases, the configuration of the roads and sidewalks, and the above-described obstructions, and orientations prevent this perpendicular placement of the APS unit. Moreover, in many cases, it is not possible to safely install an APS unit to meet optional safety guidelines issued by the Manual of Uniform Traffic Control Devices (the "MUTCD"), which itself recognizes that installation of APS is strictly discretionary with any municipality or public entity.

12. In addition, although the County may own a particular roadway, the County may not have access to or jurisdiction over the adjacent sidewalk area where it would be most appropriate to safely and adequately situate an APS unit when it is owned by a city, town or village in the County. This has occurred in at least one instance, where the County intended to install an APS unit in the Incorporated Village of Garden City. However, the Village of Garden City Buildings Department issued a "Stop Work" order preventing the County from installing the APS unit in the desired an appropriate manner, and the installation had to be reconfigured.

(Affidavit of Kenneth G. Arnold, sworn to on Dec. 12, 2012 ("Arnold Aff.") ¶¶ 10-12.)

In response, Plaintiffs assert that Defendants' "claim that installation of APS constitutes a fundamental alteration[ or an] undue burden, or that installation is infeasible . . . is baseless." (Pls.' Mem. in Reply at 3.) However, in contradiction to Plaintiffs' assertion, as noted by Defendants, Plaintiffs also concede that "it may be technically infeasible to install APS at every intersection that currently utilizes pedestrian traffic signals." (Pls.' Mem. in Opp'n. at 1.)

Here, the Court has not been provided with any evidence as to (1) which locations it would/would not be structurally impracticable to install APS, (2) which locations the installation of APS would/would not fundamentally alter the service, program, or activity provided, and (3) which locations the Defendants did/did not alter the existing pedestrian crossing signal facilities

to the "maximum extent feasible."  Instead, Plaintiffs assert generally that, "[w]hile it may be technically infeasible to install APS at every intersection that currently utilizes pedestrian traffic signals, . . . the vast majority of intersections in the County can readily accommodate APS," (*id.*), and, Defendants generally assert that "APS cannot be installed at all intersections."  (Defs.' Reply in Support at 4.)  Accordingly, there is an issue of fact as to the extent Defendants are required to comply with the applicable regulations which precludes a granting of summary judgment in favor of either party.[7]

---

[7] Although Plaintiffs argue that "[t]he only applicable defense [D]efendants can raise [to their obligation to develop a transition plan] would be to claim that . . . alterations [to the existing facilities] would create an undue burden," (Pls.' Mem. in Support at 25), under 28 C.F.R. § 35.150(a)(3), a public entity does not have to take any action that "would result in a fundamental alteration in the nature of a service, program, or activity *or* in undue financial and administrative burdens."  (emphasis added).  While the Defendants do not appear to assert a defense founded upon undue financial or administrative burdens, they do assert a defense that making changes to their existing facilities would result in a fundamental alteration to their service, activity, and program.  Accordingly, there is an issue of fact as to whether Defendants were required to develop a transition plan because there is an issue of fact as to whether actions taken as to their pedestrian crossing signal service, program, or activity would fundamentally alter such service, program, or activity.  In addition, the Court notes that it is unclear in any event whether Plaintiffs have a private right of action to enforce the transition plan regulation, 28 C.F.R. § 35.150(d), or the self-evaluation regulation, 28 C.F.R. § 35.105.  *Cf. Abrahams v. MTA Long Island Bus*, 644 F.3d 110, 119-20 (2d Cir. 2011) (finding that "[a]lthough [49 C.F.R.] § 37.137(c) may create a procedural requirement that a public entity permit ongoing public participation in developing and assessing the paratransit services it offers to individuals with disabilities, the absence of such a requirement from § 12143 indicates that Congress did not provide that an entity's failure to do so constituted discrimination under § 12143.  If this failure to permit public participation does not constitute discrimination under § 12143, § 37.137(c) may not, we hold, be enforced in a private right of action based on § 12143."); *see also Iverson v. City of Boston*, 452 F.3d 94, 101 (1st Cir. 2006) (finding that neither the transition plan regulation nor the self-evaluation regulation are enforceable through a private suit); *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 914 (6th Cir. 2004) (finding that the transition plan regulation is not enforceable through a private suit); *but see Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 856-59 (10th Cir. 2003) (finding that the self-evaluation and transition plan regulations are enforceable through a private suit), *overruled in part on other grounds by Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).  However, this issue will not be determined by the Court at this time as it was not raised by the parties in their submissions.

*CONCLUSION*

For the reasons stated above, the parties' summary judgment motions are denied.

**SO ORDERED.**

Dated: Central Islip, New York
        June 2, 2014                      _____/s/_____
                                          Denis R. Hurley
                                          United States Senior District Judge